UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY SHARPE,

                Plaintiff,

v.

CITY OF SOUTHFIELD, *et al.*,

                Defendants.

_____/

Civil Action No. 20-cv-13172

Judith E. Levy
United States District Judge

David R. Grand
United States Magistrate Judge

## <u>REPORT AND RECOMMENDATION TO DENY</u><br><u>DEFENDANTS' MOTION FOR SUMARY JUDGMENT (ECF No. 55)</u>

In his operative amended complaint for civil rights violations, plaintiff Anthony Sharpe ("Sharpe") sues four Southfield Police Department officers – William Pieroni ("Pieroni"), Christopher Don ("Don"), Steven Hendricks ("Hendricks"), and Joseph Martinez ("Martinez") (collectively "Defendants") – alleging they violated his rights under the Fourth Amendment by "searching [his] home without probable cause and using excessive force in [his] arrest"[1] once they were inside.  (ECF No. 16).

_____

[1] Also named as defendants in this action were the City of Southfield and the Southfield Police Department.  (ECF Nos. 1, 16).  However, on December 13, 2021, this Court issued a Report and Recommendation to dismiss Sharpe's claims against these defendants, as well as Sharpe's state law claims against the defendant officers for gross negligence and intentional infliction of emotional distress.  (ECF No. 34).  The Report and Recommendation was adopted by the Honorable Judith E. Levy on February 10, 2022.  (ECF No. 36).  Sharpe also agreed to withdraw his claims for substantive due process violation, warrantless entry into and search of his home, unlawful arrest, and malicious prosecution.  (ECF No. 26, PageID.224).  Thus, the sole remaining claims in this case are the ones related to the defendant officers' alleged use of excessive force against Sharpe.

On April 6, 2023, Defendants filed a Motion for Summary Judgment.[2]  (ECF No. 55).  Sharpe filed a response (ECF No. 69), and Defendants filed a reply (ECF No. 70).  Oral argument was held on November 21, 2023.  Subsequently, with the Court's permission, the parties filed supplemental briefs in support of their respective positions, Sharpe on December 15, 2023, and Defendants on December 22, 2023.  (ECF Nos. 73, 74).  The matter is now ripe for ruling.

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **(ECF No. 55)** be **DENIED**.

## II.    REPORT

### A.    Factual Background[3]

Sharpe alleges that at approximately 11:00 p.m. on December 2, 2017, Defendants responded to a "domestic complaint" at his home in Southfield, Michigan.  (ECF No. 16, PageID.118).  Apparently, Sharpe's wife, Dianna Sharpe ("Dianna"), had called 911 to report a physical altercation between Sharpe and his brother.  (ECF No. 55-2, PageID.708-10).  Dianna told the 911 operator that two brothers were fighting, and that Sharpe's brother had broken a bottle and was trying to stab Sharpe with it; however, "[t]owards the end of the [911] call," Dianna told the operator that Sharpe's brother had left the home.  (*Id.*,

---

[2] On June 1, 2023, the motion was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 62).

[3] At the summary judgment stage, "the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party."  *Naji v. City of Dearborn*, No. 23-10521, 2023 WL 9051257, at *2 (E.D. Mich. Dec. 29, 2023).

2

PageID.712-13).  By the time Defendants arrived on the scene, only Dianna and Sharpe were there.  (ECF No. 16, PageID.118).

At his deposition, Sharpe confirmed that he and his brother got into an "altercation," during which Sharpe's brother tried to hit him with a broken bottle.  (ECF No. 55-4, PageID.754, 756).  At some point, Sharpe stepped on some glass fragments, which he did not realize until he looked down and saw some blood on the floor.  (*Id.*, PageID.756-57).  Sharpe testified that he was wiping blood off the bottom of his foot when he heard a "boom" at his door.  (*Id.*, PageID.765).  When Sharpe opened the front door, he saw Defendants there – "almost in [his] house" – because Don had broken the screen door.  (*Id.*).  Don asked if Sharpe needed medical attention, which Sharpe declined.  (*Id.*, PageID.765-66).  According to Sharpe, the following then transpired:

> And at that point [Don] said, "We're coming in."  He said, "Step back, sir.  We're coming in."  And I said, "No, you're not."  And he says, "We're coming in.  We got to come in there.  We're coming in."  And I said, "No, not without a warrant, and not with that attitude."
>
> And that's when one of them from the back, it might have been – I don't know.  One of them said, it was either Martinez or the other, the other guy, the big guy.  One of them said, because it came from the second row of them.  There's Pieroni and Don was standing in the front row, and then you have Martinez, and I forgot his name.  They were standing in the back.
>
> And one of them said, "I'm tired of this shit."  And I said, "Me, too."  And I went to close the door, and that's when they bust in, bust in my house.  And after they bust in, it's like it was just a scurry.
>
> I remember going down.  I remember hitting the ground really hard.  And I remember they kept saying, "Stop resisting.  Stop resisting."  And I was yelling, "How the fuck am I resisting?  I'm not resisting.  I'm not resisting."  I was like, "You're saying that because you want to try and kill me."  And they were all on me.

3

And then I remember getting snatched up, slammed up against the wall. And Don, Don had me up against the wall with his, with his hand like in my back. And I think it was Pieroni had his hand on my neck, and smashed it, smashed my head up against the wall. And I was standing there, and they cuffed me.

And we were arguing. We was just yelling. And I was telling them, "You don't have to do me like this. This is wrong. This is wrong."

\*     \*     \*

The other guy, he had just rummaged through the bedrooms flashing the lights on my daughters. And then he came back. And I remember when Martinez came back, one of the officers asked, "What did you find?" And I remember that struck a nerve with me, what did you find, as if they were looking for something other than an individual.

And at that point, you know, they – they just marched me out the house.

\*     \*     \*

One of them, I know it wasn't Pieroni, because he was the one that told me, "All you had to do is shut up, and you wouldn't be going to jail." And it was one of them says, "Next time the police tell you to do something, boy, you do it." And I remember looking at him like fuck you, and excuse my language.

\*     \*     \*

They had no reason to do that. We were standing at the door. They could have – we had enough – we talked long enough for those guys to know that I wasn't putting anybody in danger. That my house was quiet and calm. They did nothing to deescalate the situation.

… I told them that my brother was – my brother had just left. I told them my brother had just left. "If you go down Corrine Street, ya'll will catch him. He's in a gray truck. They said, "No, we here talking with you." I say, "Yeah, you're wasting time."

And from that point on, in my mind, I knew it was bad. I knew it was bad, because I'm telling you where the bad guy is, but you don't want to hear it. So I end up the bad guy, and [my wife is the one who] called [911].

4

(*Id.*, PageID.766-70).

Later in the deposition, when asked about Sharpe's testimony that officers "snatched [him] up" while he was in handcuffs, he testified:

> They grabbed me by the handcuffs, because I'm cuffed. I'm on the ground, and I'm cuffed. They grabbed the handcuffs, and snatched me up. Picture a man with his hands behind his back tied. And an officer or person grabbed them from the handcuffs, and snatched him up, and then throw him up against the wall.

(*Id.*, PageID 775-76).[4]

When asked to specify exactly which of the four defendant officers touched him, Sharpe testified clearly that "[a]ll four of them touched me when they threw me on the ground" and that there were feet and knees on him when he was on the ground. (*Id.*, PageID.769, 774). He also stated that he was able to catch his fall and did not land on his face; however, "after it was all said and done," he had a bruise on his shoulder[5] and lacerations around his wrists from the handcuffs.[6] (*Id.*, PageID.772-73).

Defendants' versions of the events at issue differs drastically from that of Sharpe's. Essentially, their testimony – set forth in the most detail by Officer Don – is that when they

---

[4] Dianna testified that she did not see Sharpe being handcuffed, but that when she entered the living room, she saw him "pressed up against the wall[,]" with his arms handcuffed behind his back. (ECF No. 55-2, PageID.729-30). She heard Sharpe tell the officers that they were "hurting" him and to "get off of him." (*Id.*, PageID.733).

[5] Sharpe provided photos of what he contends are the bruises he suffered to his arms and shoulders as a result of Defendants' alleged conduct. (ECF No. 73-5). The bruises appear reasonably consistent with Sharpe's description of Defendants' alleged use of force.

[6] In his amended complaint, Sharpe alleges that he was "placed in handcuffs which were too tight"; that he complained about the handcuffs and asked that they be loosened; that Defendants refused to loosen the handcuffs; and that after he was released from custody, he went to urgent care, where he was treated for lacerations to his wrists (as well as soreness in his neck and back and bruising to his left arm). (ECF No. 16, PageID.119).

arrived at Sharpe's house, he told them he had not called 911, his brother was gone, and he did not want the police at his door.  (ECF No. 55-5, PageID.786, 789).  When Officer Don told Sharpe that he still needed to check the inside of the house to make sure everyone was okay, Sharpe tried shutting the door, at which point Officer Don pushed the door open and told him he was under arrest for obstructing their investigation.[7]  (*Id.*, PageID.790-92).  Sharpe was instructed to turn around and put his hands behind his back, which he did; Officers Don and Pieroni then handcuffed Sharpe.  (*Id.*, PageID.793-96).  Defendants maintain that at no time was Sharpe taken to the ground or pushed up against a wall.  (*Id.*, PageID.796-97).

## B.    Standard of Review

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court

---

[7] Although Sharpe was charged criminally with obstruction, he contends that on April 18, 2018, he was acquitted of all charges against him.  (ECF No. 16, PageID.120).

of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

### C.   Analysis

As set forth above, Sharpe's sole remaining claim in this case is that Defendants violated his Fourth Amendment right to be free from excessive force in two respects: (1) by throwing him to the ground, pinning him against a wall, and smashing his head into a wall; and (2) by placing him in handcuffs that were too tight and refusing to loosen them when requested. In their motion for summary judgment, Defendants argue that they are

7

entitled to qualified immunity because there was no violation of a clearly established constitutional right.[8]  For the reasons set forth below, the Court disagrees.

### 1.    The Applicable Legal Standards

### a.    Qualified Immunity

The doctrine of qualified immunity insulates state actors from liability in close-call situations.  *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct).  Once the qualified immunity defense is raised, at the summary judgment stage, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established."  *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016).  A right is clearly established when "reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered."  *Bell v. City of Southfield, Mich.*, 37 F.4th 362, 367 (6th Cir. 2022) (citing *Cunningham v. Shelby Cty., Tenn.*, 994 F.3d 761, 765 (6th Cir. 2021)).  "Although a case directly on point is not necessary to overcome qualified immunity, existing precedent must have placed the … constitutional question beyond debate."  *Linden v. City of Southfield, Mich.*, 75 F.4th 597, 602 (6th Cir. 2023) (internal quotations omitted).

### b.    Excessive Force Incident to Warrantless Entry

In *Reed v. Campbell Cty., Ky.*, 80 F.4th 734 (6th Cir. 2023), the Sixth Circuit very

---

[8] The qualified immunity defense may be raised at any stage of the case.  Where, as here, it is raised in a motion for summary judgment, courts must weave the summary judgment standard into each step of the qualified immunity analysis.  *See Scott v. Harris*, 550 U.S. 372, 377-78 (2007).

recently and succinctly explained the legal principles that govern a case like Sharpe's, where police officers enter a person's home without a warrant, and then allegedly use excessive force against him:[9]

> The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause ...." U.S. Const. amend. IV. At its core, the Fourth Amendment protects the right of an individual to "retreat into his own home and there be free from unreasonable governmental intrusion." *Payton v. New York*, 445 U.S. 573, 590 [] (1980) (quoting *Silverman v. United States*, 365 U.S. 505, 511 [] (1961)). It is therefore "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586, [] (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 [] (1971)); *see also Michigan v. Fisher*, 558 U.S. 45, 47 [] (2009) (per curiam) (same).
>
> The Fourth Amendment, however, "does not prohibit all unwelcome intrusions 'on private property' – only 'unreasonable' ones." *Caniglia v. Strom*, ⸺ U.S. ⸺, 141 S. Ct. 1596, 1599 [] (2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 [] (2013)). Thus, there are some exceptions to the warrant requirement for searches or seizures within a home, including an exception for "exigent circumstances." *Lange v. California*, ⸺ U.S. ⸺, 141 S. Ct. 2011, 2017 [] (2021). This "well-recognized exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Williams v. Maurer*, 9 F.4th 416, 431 (6th Cir. 2021) (alteration in original) (quoting *Kentucky v. King*, 563 U.S. 452, 460 [] (2011)). "[T]he need to assist persons who are seriously injured or threatened with such injury" is one such exigent circumstance. *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 [] (2006)). The Court has held that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham*

---

[9] The Court recognizes that Sharpe agreed to withdraw his claim for an unlawful warrantless entry into his home. *See supra* at 1, n.1. However, as explained below, the "facts and circumstances" related to Defendants' warrantless entry into Sharpe's home still bear on the reasonableness of their actions once they were inside.

*City*, 547 U.S. at 403 []. Though "'[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception,' ... they must have an objectively reasonable basis for believing that 'a person within the house is in need of immediate aid.'" *Gradisher v. City of Akron*, 794 F.3d 574, 584 (6th Cir. 2015) (quoting *Fisher*, 558 U.S. at 47, 49 []). And "their decision to enter must be based on more than a hunch or 'the mere possibility' that someone inside needs immediate aid." *Id.* (quoting *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 545 (6th Cir. 2013)). "To determine whether a law enforcement officer faced an emergency that justified acting without a warrant," we must "look[ ] to the totality of circumstances." *Missouri v. McNeely*, 569 U.S. 141, 149 [] (2013). If a reasonable jury could conclude that there were no exigent circumstances, then there was a constitutional violation. *See Barton v. Martin*, 949 F.3d 938, 949 (6th Cir. 2020).

*Reed*, 80 F.4th at 742-43.

Moreover, under the Fourth Amendment, a police officer, in the course of making an arrest, investigatory stop, or other "seizure" of a person may use only such force as is objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). Under the "objective reasonableness" standard, a court analyzes whether "the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (internal quotations omitted). Reasonableness is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotations and citations omitted).

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotations and citation omitted). Determining whether there has been a Fourth

Amendment violation by an individual officer requires consideration of "(1) the severity of the crime at issue; (2) the threat of immediate danger to the officers or bystanders; and (3) the suspect's attempts to resist arrest or flee." *Wysong v. City of Heath*, 260 F. App'x 848, 854 (6th Cir. 2008) (citing *Graham*, 490 U.S. at 396). "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). Courts considering the objective reasonableness of a police officer's actions also must account for "the fact that police officers are often forced to make split-second judgments –in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. This standard represents "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). Each officer can be held liable only for his own wrongdoing, so courts must review the actions of each officer separately. *See Reed*, 80 F.4th at 748.

2.    *Entry into Home, Takedown, and Arrest*

Considering each of the three *Graham* factors, and accepting Sharpe's version of the incident in question, as Defendants concede the Court must at this stage of the case (ECF No. 55, PageID.681), a reasonable jury could conclude that Defendants violated Sharpe's clearly established right to be free from excessive force when they threw him to the ground, and then up against the wall, "smashed" his head into it, and finally "snatched" him up by the handcuffs that had been placed on him with his hands behind his back.

11

In *Reed*, the Sixth Circuit considered a very similar situation, in which officers responded to a 911 call reporting a domestic dispute. *Id.* at 739. When they arrived, however, all was quiet, and they could not detect any signs of an altercation. The officers knocked on Reed's front door, but after a brief verbal exchange, Reed refused to engage further with the officers because they did not have a warrant. Reed then attempted to close the door, but one of the officers then "kicked the door down," pointed a gun at Reed's head, grabbed him by the arm, and forcibly removed him from his home. Applying these facts against the above-referenced standards, *see supra* at 8-11, the Sixth Circuit found that a reasonable jury could conclude that no exigent circumstances existed, and that "the officers violated Reed's constitutional rights by entering his home without a warrant." *Id.* at 745.

The Sixth Circuit then turned to Reed's excessive force claim. Importantly, in analyzing the *Graham* excessive force factors, the Court noted how they were largely intertwined with the officers' improper warrantless entry into Reed's home:

> A reasonable jury could conclude that [Officer] Curtis used excessive force when he pointed a gun at Reed's head, grabbed Reed by the arm, and pulled him out of his home and onto the porch. The severity of the crime at issue was minimal. The officers contended that they reasonably suspected Reed was obstructing their investigation …. When law enforcement officers who are not armed with a warrant knock on a door ... the occupant has no obligation to open the door or to speak. ... And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time….
>
> *                *                *
>
> Curtis also had no reasonable basis to believe that Reed posed a threat to safety. Reed denied that a dispute had occurred, declined to interact further with the police because they did not have a warrant, and

remained within the safety of his home….

Finally, Reed did not resist being detained.  The officers frame Reed's behavior as "openly hostile" because "[t]he first words out of his mouth in response to a simple greeting were, 'You got a warrant?'" The question of Reed's hostility is a question for the jury; a reasonable jury could watch the body camera footage and conclude that Reed was not hostile.  True, Reed did not facilitate the officers' request to speak with others in the house and attempted to end the encounter.  But withdrawal into the home does not constitute resistance…. [R]efusing to permit police officers to enter one's home or refusing to continue an interview with an officer outside of one's home also cannot constitute "active resistance" sufficient to justify a use of force.  "[A]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  []  It would undermine the foundational principles of the Fourth Amendment to say that retreating into one's home constitutes active resistance justifying the use of force.

The totality of the circumstances did not justify Curtis's actions.  Curtis pointed his service weapon at Reed's head, which is a considerable use of force.  A reasonable jury could find that Curtis did so after entering Reed's home without exigent circumstances and without any basis to think that Reed committed a serious crime or posed a threat to Curtis's or others' safety.

A jury could also conclude that Curtis's subsequent actions – grabbing Reed by the arm and pulling him out of his home – were also unreasonable under the totality of the circumstances.  [E]ven minor uses of force are unconstitutionally excessive if they are totally gratuitous.  Because the jury could conclude that the officers had no right to be inside [Reed's] home to detain him in the first place, it would follow that Curtis had no right to use force because such force would necessarily be gratuitous.

*Reed*, 80 F.4th at 748-50 (internal quotations and citations omitted).

Considering the analysis set forth in *Reed*, and applying the *Graham* factors, Sharpe has established a genuine issue of material fact that Defendants used excessive force with respect to his takedown and arrest.  In terms of the severity of the crime at issue, as in *Reed*, the alleged crime at issue was, at most, obstructing an investigation, which the Sixth Circuit

characterized as "minimal." *Id.* at 748.  As in *Reed*, Defendants here attempt to justify their actions by suggesting there was some threat of immediate danger, pointing out that Sharpe "admittedly was agitated when he opened the door"; that he told the officers they could not enter his house without a warrant; and that he acknowledged "trying to close the door on the officers."  (ECF No. 55, PageID.696-97) (citing ECF No. 55-4, PageID.766, 771).  However, simply because Sharpe was "agitated" does not mean that Defendants had a reasonable basis to believe that he posed a threat to their safety, or to the safety of anyone else in the house, as he did not have a weapon and was not behaving in a threatening manner.  And, as set forth above, Sharpe was under no obligation to allow Defendants to enter his home when they admittedly did not have a warrant and there were no circumstances suggesting a "real exigency" within the home that would justify a warrantless entry.  *Reed*, 80 F.4th at 748 (citing *King*, 563 U.S. at (2011) and *Williams*, 9 F.4th at 434.  Indeed, Dianna testified at her deposition that she informed the 911 operator that it was Sharpe's brother who had been the assailant, and that he had already left the home.  (ECF No. 55-2, PageID.712-13).  Since Defendants were dispatched to the scene by the 911 operator, it can reasonably be inferred, *Naji*, 2023 WL 9051257, at *2,  that they were apprised of this information prior to their arrival.  Moreover, Sharpe specifically testified that when officers arrived, his "house was quiet and calm," and that he had "told [the officers] [his] brother had just left" and that he did not need medical attention.  (ECF No. 55-4, PageID.765, 769).

Construed in the light most favorable to Sharpe, the totality of the circumstances did not justify Defendants' actions in using force against Sharpe inside his home.

Defendants were aware that no imminent safety threat existed at the time they decided to enter Sharpe's home, and, as in *Reed*, Sharpe's refusal to talk with them and attempt to close his door while he was inside "cannot constitute 'active resistance' sufficient to justify a use of force." *Reed*, 80 F4th at 749.  This also is not a case where the use of force was minimal and non-gratuitous.  Sharpe described being thrown violently to the floor, having his body and head "slammed" and "smashed" into the wall, and then being "snatched" up from the ground forcefully by the wrists while they were handcuffed behind his back.  He presented photos of significant bruises that appear consistent with his description of the events.  In sum, construing all reasonable inferences in Sharpe's favor, a question of fact exists as to whether the force applied by Defendants[10] was excessive and, thus, violated Sharpe's Fourth Amendment rights.

Defendants also argue that they are shielded by qualified immunity because, at the time of the events in question, it was not clearly established that their actions violated

---

[10] Defendants also argue that Sharpe has only specified that two individual officers – Don and Pieroni – used excessive force with respect to the takedown and, thus, summary judgment is appropriate on his claims against Hendricks and Martinez related to this incident.  (ECF No. 55, PageID.698-701).  It is true that each officer can be held liable only for his own wrongdoing, and courts must review the actions of each officer separately.  *See Reed*, 80 F.4th at 748.  However, Sharpe clearly testified at his deposition that all four of the officers touched him when they threw him to the ground, and all four of them "had [him] down[.]"  (ECF No. 55-4, PageID.769).  Defendants question why Sharpe is unable to identify which specific officer allegedly took each action, but given the situation he described, in which he was thrown to the ground (face down), and then against a wall (with the officers behind him), it makes sense that Sharpe might not have been in a position to identify who took each specific action.  Thus, considering Sharpe's testimony, and viewing the evidence in the light most favorable to him, a genuine issue of material fact exists as to whether all four of the defendant officers were involved in the application of the force at issue.  *See Pershell v. Cook*, 430 F. App'x 410, 416 (6th Cir. 2011) (affirming the denial of qualified immunity to three police officers alleged to have used excessive force during an arrest where the plaintiff was unable to see the officers standing above and behind him at the precise moment of the constitutional violation because he was facedown and had his glasses removed).

Sharpe's constitutional rights.  (ECF No. 55, PageID.691-98).  Relying on *Rivas-Villegas*

*v. Cortesluna*, 595 U.S. 1, 6 (2021), Defendants stress that courts are "not to define clearly

established law at too high a level of generality particularly when addressing fourth

amendment claims."  (ECF No. 70, PageID.947-48).  Thus, Defendants ask what published

cases, from the Sixth Circuit or the United States Supreme Court, would have "put [them]

on notice that the actions they supposedly took as described by Mr. Sharpe were clearly

established to be unconstitutional?"  (*Id.*, PageID.949; *see also* ECF No. 74, PageID.1008).

Citing to a ***2006*** case, however, the Sixth Circuit in *Reed* explained:

> It is clearly established law that officers may not use gratuitous
> violence against individuals who are not actively resisting.  *E.g.,*
> *Shreve v. Jessamine Cty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006)
> ….

*Reed*, 80 F.4th at 750.  Clearly, then, long before the events at issue in this case, the Sixth

Circuit determined that the principle that officers may not use gratuitous violence against

individuals who are not actively resisting is not defined at "too high a level of generality."

*Rivas-Villegas*, 595 U.S. at 6.  Here, for the reasons discussed above, the facts in the light

most favorable to Sharpe show that he was not "actively resisting," and Defendants were

therefore on notice at the time of the events in question that their alleged use of force inside

Sharpe's home – slamming him to the ground, throwing him against the wall, "smashing"

his head into the wall, and "snatching" him up by the handcuffs behind his back – was

unlawful.[11]  *Id.*  Thus, Defendants' argument that they could not have been aware that their

---

[11] Defendants also argue – somewhat in passing – that they did not have "fair warning that [their]
actions [were] unconstitutional" because the law in December 2017 "require[d] some evidence of
serious injuries," and Sharpe could only point to "some bruising on a shoulder or arm."  (ECF No.

actions violated a clearly established right is without merit.[12]

### 3. Handcuffing

In his amended complaint, Sharpe also specifically alleges that Defendants used excessive force in handcuffing him too tightly and refusing to loosen the cuffs when he complained that they were too tight, causing him to suffer wrist lacerations. (ECF No. 16, PageID.119) ("Plaintiff was placed in handcuffs which were too tight. Plaintiff complained about the handcuffs and requested that the handcuff would be loosened because the handcuffs were causing injury to Plaintiff's wrists. The officers did not listen to Plaintiff or loosen the handcuffs. After Plaintiff was released from custody, Plaintiff immediately went to urgent care where he was treated for lacerations to his wrists …."). In the specific context of a claim for excessive force by way of unduly tight or excessively forceful

---

55, PageID.697-98). This argument lacks merit. While the degree of injury suffered by the plaintiff might be relevant to whether the force applied was excessive, Defendants cite no caselaw for the proposition they appear to advance here – namely, that as of December 2017, it was reasonable to use gratuitous force against an individual who was not resisting, so long as "serious injuries" were not inflicted. Indeed, dating back to at least 2009, the Sixth Circuit has specifically held that the proper inquiry is whether gratuitous violence was inflicted, not the extent of the injury inflicted. *See Williams*, 9 F.4th at 439; *Morrison*, 583 F.3d at 406; *Barton v. Martin*, 949 F.3d 938, 954 (6th Cir. 2020).

[12] In support of their argument that they did not violate a clearly established right, Defendants cite several Sixth Circuit cases in which qualified immunity was either granted to or denied a defendant officer who used some level of force in subduing a suspect. (ECF No. 55, PageID.691-98). From these cases, Defendants seem to suggest that – because decisions go both ways on this issue – it could not have been clearly established in 2017 that their actions violated Sharpe's constitutional rights. (ECF No. 70, PageID.947-49). But, in several of the cases cited by Defendants, the courts recognized that the use of gratuitous force against an individual who is not resisting or fleeing an arrest is unconstitutional. *See Scheffler v. Lee*, 752 F. App'x 239, 251 (6th Cir. 2018) (recognizing that the gratuitous use of force might be unreasonable); *Goodrich v. Everett*, 193 F. App'x 551, 556 (6th Cir. 2006) (same); *Zucker v. City of Farmington Hills*, 643 F. App'x 555, 568 (6th Cir. 2016). Again, viewed in the light most favorable to Sharpe, those are the facts here, meaning that qualified immunity is not appropriate. *Reed*, 80 F.4th at 745-46.

handcuffing, the Sixth Circuit has explained:

> In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced some physical injury resulting from the handcuffing.

*Baynes v. Cleland*, 799 F.3d 600, 608 (6th Cir. 2015) (internal quotations omitted) (quoting *Morrison*, 583 F.3d at 401).

In their motion for summary judgment, Defendants, in recounting Sharpe's "version" of the events, made no mention of his allegations that Defendants had handcuffed him too tightly or that they refused his requests that they loosen the handcuffs, though later in their discussion of Sharpe's interrogatory answers about his injuries, they note that Sharpe stated that "his wrists were bruised from tightly applied handcuffs." (ECF No. 55, PageID.683, 687). As for their argument, Defendants merely asserted, in reference to *Lee v. City of Norwalk, Ohio*, 529 F. App'x 778 (6th Cir. 2013), "[i]n 2013, the Sixth Circuit told law enforcement that a detainee complaining of handcuffs being too tight who became agitated and threw a paper on the ground was not subjected to excessive force." (*Id.*, PageID.696).

At oral argument the Court questioned whether Defendants' motion was directed to Sharpe's handcuffing claim. Indeed, in the last paragraph of their motion, Defendants wrote, "here, all [Sharpe] points to is some bruising on a shoulder or arm," failing to mention anything about the injuries Sharpe alleged to his wrists. (*Id.*, PageID.698). Defendants responded that their approach owed to the fact that Sharpe had failed to come forward with admissible evidence that he complained the handcuffs were too tight and that

those complaints were ignored, and that it appeared he had essentially abandoned the handcuffing claim.

Sharpe insisted at the hearing that he had not abandoned his handcuffing claim and requested an opportunity to supplement the summary judgment record with evidence regarding that claim. (*See* 11/21/23 text entry). The Court allowed him to do so, and allowed the Defendants to file a response to whatever Sharpe filed. (*Id.*). On December 15, 2023, Sharpe submitted an affidavit in which he averred, in relevant part:

> 15. After I was handcuffed, I was lifted/snatched up by the handcuffs and thrown against the wall. I was not resisting.
>
> \*     \*     \*
>
> 18. When I was placed in the handcuffs, they were put on too tight.
>
> 19. I complained about the handcuffs both in my home and outside while I was taken to the patrol car and told to get in.
>
> 20. When I complained about the handcuffs in my home, all Defendants were present, ignored my complaints and did nothing to loosen the handcuffs.
>
> 21. While I was walking to the patrol car I requested that the handcuffs be loosened and I complained again when I initially got in the car.
>
> 22. The handcuffs were never loosened, and I was in pain.
>
> 23. The tightness of the handcuffs along with the force used to pick me up by the handcuffs caused me a great amount of pain and injuries to my wrist.
>
> 24. After I was released from custody, I immediately went to urgent care where I was treated for injuries to my wrists, soreness in my neck and back, and bruising on my arms.

(ECF No. 73-2, PageID.964).

In other words, Sharpe makes clear in his affidavit his position that he complained

about the handcuffs being too tight while inside his home, while walking to the patrol car, and while getting into the patrol car.  (*Id.*).

In their responsive filing, Defendants invoke the "sham affidavit" rule, arguing that Sharpe's affidavit does not create a material question of fact because "['a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.'"  (ECF No. 74, PageID.1004) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)).  Specifically, Defendants argue:

> Plaintiff's affidavit that he complained to unidentified officers about the handcuffs constitutes a sham affidavit.  Attached hereto as Exhibit 1 are pages 96 through 113 of Plaintiff's deposition where he was asked about the incident.  Starting at line 12 on page 96, Mr. Sharpe was asked to explain what happened.  The 18 pages go into detail about what took place.  At page 106, line 21, he mentioned being handcuffed, but did not say anything about complaining about the tightness of the handcuffs.  Throughout these passages, he did not hesitate to relay what he said.  As an example, at page 108, starting at line 21 through page 109 line 17, he recounted his conversation with the officers, yet does not mention that he complained about the handcuffs.  Then on page 109, line 18, he was asked:
>
> > Anything happen on the way – are there any complaints with from [sic] your house to the police station?
>
> He responded:
>
> > "It's just one little incident.  When we were driving, and Officer Don pressed on the brakes real hard, and it kind of like jerked me, and I hit the back of the back seat, the partition.  I hit that."
>
> This directly contradicts what he states in his affidavit.  He was given the opportunity to, and he did explain what took place from his house to the police station, yet nowhere in his deposition did he ever say that he complained about the handcuffs.  Admittedly, he said that he had lacerations around his wrists, page 112, line 17, but yet never

> mentioned any complaints about the tightness of the handcuffs to one
> of the defendants.

(ECF No. 74, PageID.1006-07).

Defendants' argument lacks merit.  As the Sixth Circuit recognized in *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968 (6th Cir. 2019), in evaluating the admissibility of a post-deposition affidavit, the issue is whether the affidavit "directly contradicts" the nonmoving party's prior sworn testimony, and the Sixth Circuit applies a "relatively narrow definition of contradiction." *Id*. at 976 (citations omitted).  If a party "was not directly questioned about an issue," a later affidavit on that issue simply "fills a gap left open by the moving party," because a deponent has "no obligation to volunteer information the questioner fails to seek." *Id.* (citations omitted).  "[I]f no direct contradiction exists, the district court should not strike or disregard th[e] affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue." *Id.* (internal quotations and citations omitted).  Contrary to Defendants' argument, nothing in Sharpe's affidavit "directly contradicts" his prior testimony.

Returning to Defendants' argument, it is true that Sharpe "was asked about the incident" and spent a number of pages "go[ing] into detail about what took place" without mentioning making a complaint about the handcuffs being too tight.  But it is hardly the case that Sharpe walked back his illegal handcuffing claim during his deposition, let alone abandoned it.  Defendants themselves admit that Sharpe specifically testified about receiving "lacerations around his wrists, [on] page 112, line 17," and a few pages earlier in the deposition, Sharpe specifically attributed the lacerations to the handcuffs.  (ECF No.

74-2, PageID.1020) ("I had just some lacerations around my – around my wrists from the handcuffs."). Defendants' counsel was aware from both Sharpe's complaint and interrogatory answers that he was asserting an unlawful handcuffing claim based not only the fact that his wrists were injured, but on Defendants' alleged refusal to loosen the handcuffs despite being asked. (ECF No. 16, PageID.119; ECF No. 55-10, PageID.863). If Defendants' counsel wanted to learn the details of that aspect of Sharpe's claim, the issue was teed-up for him, and it was incumbent on him to question Sharpe in detail about those allegations in order to flesh out the facts, if any, supporting them. *See, e.g., Johnson v. Williams*, No. 15-13856, 2017 WL 11318160, at *8 (E.D. Mich. Aug. 7, 2017) (observing that defense counsel "misconstrued an ambiguous question/answer as a 'gotcha' moment" rather than asking necessary follow-up questions). Because counsel did not specifically question about Sharpe about his alleged requests that the handcuffs be loosened, rather than "directly contradicting" his testimony, Sharp's later affidavit on that matter merely "fills a gap left open by the [Defendants]."[13]

Finally, other evidence in the record supports Sharpe's allegations that Defendants used excessive force with respect to his handcuffing. Specifically, Sharpe's wife, Dianna, testified that she thought she recalled Sharpe complaining that "the handcuffs were too

---

[13] Defendants note that when asked, "Anything happen on the way – are there any complaints [] from your house to the police station?" Sharpe only mentioned that the officer "pressed on the brakes real hard, and it kind of like jerked me, and I hit the back of the backseat." (ECF No. 74-2, PageID.1025). But this portion of Sharpe's testimony relates solely to the period of time when he was riding in the police car, and Sharpe is not contending that he complained about the handcuffs at that time. (ECF No. 73-2, PageID.964). Thus, Sharpe's affidavit does not contradict his testimony on this issue.

tight."  (ECF No. 73-4, PageID.983-84).  And urgent care records specifically note that Sharpe complained of wrist pain after being handcuffed, and lacerations were present. (ECF No. 73-6).

Given all of these facts, Sharpe has presented sufficient evidence to create a genuine issue of material fact that he complained that the handcuffs were too tight in the presence of all four Defendants; that his complaints were ignored; and that he suffered a physical injury as a result of the handcuffing.[14]  Moreover, there can be little doubt that the right to be free from unduly tight or excessively forceful handcuffing was clearly established for qualified immunity purposes at the time of the events in question.  *See, e.g., Morrison*, 583 F.3d at 401 (citing cases); *Baynes*, 799 F.3d at 613-14 ("As early as 1993, we held that it was clearly established law in this circuit … that excessively forceful handcuffing violates the Fourth Amendment prohibition against excessive force.") (citing cases).

For all of these reasons, the Court finds that Sharpe has met his burden of showing that a reasonable jury could conclude that Defendants violated his clearly established constitutional rights, both with respect to the takedown and the handcuffing aspects of his excessive force claim.  As such, Defendants' motion for summary judgment should be denied.

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion

---

[14] Sixth Circuit precedent establishes that an excessive force handcuffing claim may be alleged against officers even if those officers did not physically handcuff the plaintiff, but they heard the plaintiff's complaints and did nothing.  *See Baynes*, 799 F.3d at 608-09.

for Summary Judgment **(ECF No. 55)** be **DENIED**.

Dated: February 20, 2024                         s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

## **NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

24

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 20, 2024.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
